(Case of "The Medical College of Philadelphia.")

cation, which showed that John Saulnier, the husband of Sarah Saulnier, was living at Vera Cruz in July, 1837; and that he disapproved of James Anderson being administrator, and appointed Thomas Humphreys his representative for the purpose, and guardian for the son, &c.

On the 10th of October, 1837, the Orphans' Court dismissed the petition.

From this decree the petitioner appealed to this Court.

Mr. *Hare*, (with whom was Mr. *Kittera*,) for the plaintiff in error, cited *Ellmaker's Estate*, (4 Watts, 34).

The Court declined hearing Mr. *Sterigere* and Mr. *Freedly*, who were for the appellee.

---

*[PHILADELPHIA, APRIL 14, 1838.]　　　　　[*445]

## Case of "THE MEDICAL COLLEGE OF PHILADELPHIA."

1. The Supreme Court will not certify under the act of 1791, "to confer on certain associations the powers and immunities of corporations," where the constitution of the association confers powers not specified in that act.
2. Therefore, where the constitution of a "Medical College," submitted to the Court, contained a clause authorizing the college to confer degrees in medicine upon students and others, the Court declined certifying in favour of the application.

AN application was made at the last term of this Court by a society of physicians, for a certificate, entitling them to a charter of incorporation, under the provisions of the act of assembly of

(Case of " The Medical College of Philadelphia.)

the 6th of April, 1791, entitled "An act to confer on certain associations of the citizens of this commonwealth, the powers and immunities of corporations or body politic in law."

The following preamble was annexed to the constitution presented for the consideration of the Court.

"Whereas, we, the undersigned, physicians of Philadelphia, have agreed to associate ourselves for the purpose of claiming, on behalf of the profession, that influence over the regulation of medical instruction, and the means of medical improvement, which is so essential to the respectability of the profession, and to the best interests of humanity ; and

Whereas, we are desirous of acquiring the rights and immunities of a body politic and corporate, for the furtherance of this legal and honorable purpose.

Now, therefore, we do hereby associate ourselves, under the following Constitution for the purposes therein expressed."

The following were the material provisions of the constitution:

"Article I. The association shall forever hereafter be called and known by the name of 'The Medical College of Philadelphia.'

Article II. The object of the said college shall be to cultivate the science of medicine, and all its collateral branches; to designate *such courses of instruction as, from time to time, [*446] may be deemed necessary for the advancement of the science, and the elevation of the medical character; to examine and decide on the qualifications of candidates for degrees, and to secure these advantages to the profession."

"Article V. The said college shall have power to grant and confirm in the manner and form prescribed by its by-laws, such degrees in medicine, to such students or others, whom, by their proficiency in learning or other meritorious distinction, they shall deem entitled to them, as are usually conferred in other colleges and universities ; and to grant to such graduates such diplomas or certificates, under its common seal, as may authenticate and perpetuate the memory of such graduation."

"Article VII. The said college shall establish on or before the first day of June, 1837, a board of examiners, to consist of not less than six persons, physicians, resident in the city and county of Philadelphia, who shall be chosen at such times and in such manner and for such periods as the by-laws of the college shall ordain; and it shall be the duty of the said board to examine into the qualifications of such students or others as may appear before them, and to certify the same to the college."

"Article VIII. The said college shall hold regular meetings at least once in every period of three months: Provided always,

(Case of "The Medical College of Philadelphia.")

That no meeting of said college, shall be held, unless called and announced in two or more of the daily papers published in Philadelphia, at least one week before the time at which the said meeting is intended to be held."

Among the by-laws which were annexed to the constitution, were the following.

"CHAP. II. Section VIII. The college shall choose by ballot at the time of the first annual election subsequent to its organization, or as soon thereafter as convenient, six graduates of medicine, of at least ten years standing, and of distinguished reputation in their profession; each of whom shall have attained the age of thirty-five years, to serve as a board of examiners, the duties of which are hereafter prescribed. Of the said six examiners, two shall be chosen by name to serve for the term of one year, two others by name to serve for the term of two years, and two others by name to serve for the term of three years; and annually thereafter, the college shall elect by ballot, two persons, qualified as above, to serve for the term of three years, in the place of those whose term of service shall have expired.

*Section IX.—No person shall be elected a member [*447] of the board of examiners who is engaged in giving public instructions, whether by lectures or examinations, upon any branch of medical science, included in the course prescribed by the college; and if any person elected to the board of examiners shall so engage at any time during his term of service therein, his station in the board, shall thereby be rendered vacant; Provided, however, that remarks at the bed-side in an hospital, shall not be considered as constituting lectures."

"CHAP. V. Section I.—The board of examiners shall, as soon as practicable after its election, meet, and organise by appointing one of its members to act as chairman and another as dean. The board shall hold stated and other meetings as often as it may deem proper, and shall adopt such rules for its own government as may be found necessary, provided the same be not inconsistent with the constitution and by-laws of the college.

Section II.—The board shall meet regularly during the months of March and November of every year, for the examination of such candidates for the degree of doctor of medicine as have complied with the requisitions of the college and duly registered their names with the dean.

Section III.—The board shall have power to make among its members such a distribution of the duty of examination as it shall judge proper; but each member thereof present at an examination shall be required to express his opinion on the general fitness of the candidate for medical honours, without especial re-

(Case of "The Medical College of Philadelphia.")

gard to the particular branch or branches upon which he shall be called to examine.

Section VII.—Each candidate shall be examined on such branches of medicine and its collateral sciences as the college shall from time to time direct; Provided, however, that no alteration in relation to the course of instruction shall be permitted to prejudice the interests of any candidate who shall have pursued his preliminary studies, in good faith, according to the previous regulations of the college.

Section XI.—Each member of the board of examiners shall receive from the college a fee of five dollars for the examination of each candidate at which he shall have officiated agreeably to the regulations of the college.

Section XII.—The dean shall keep, in a book provided for the purpose, a full and regular list of all such candidates as, upon examination have been approved of by the board, showing their [*448] *respective ages, the states to which they belong, and the date of their examination; which list shall be open, at all reasonable times, to the inspection of the members of the college.

Section XIII.—The dean shall keep an accurate account of all sums of money received by him as fees from candidates registered for examination, and for diplomas; and shall pay the same over to the treasurer of the college."

"CHAP. VI. Section I.—Any respectable graduate in medicine who is engaged in lecturing on any one of the branches embraced in the scheme of instruction laid down for the time being by the college, and who has delivered one or more courses of lectures thereon, may be proposed as a candidate for recognition at any stated meeting of the board of examiners. At the subsequent stated meeting, the said proposal shall be decided upon by ballot, and provided four votes are given in favour of the candidate, his nomination shall be presented for the action of the college at its next stated meeting, when, if a majority of the members present shall confirm the nomination, the said lecturer shall be deemed duly recognized by the college; Provided, that the said recognition may at any time be recalled by a vote of the college.

Section II.—All lecturers, resident within the United States, who shall have been duly recognized as above, shall be notified thereof by the corresponding secretary, and the recognition shall take effect from the first Monday in March, or the first Monday in November immediately succeeding the action thereon of the college.

Section III.—Teachers of subdivisions of any of the branches embraced in the scheme of instruction laid down by the college,

(Case of " The Medical College of Philadelphia.")

may be recognized in the manner pointed out in the first section of this chapter. The subdivisions which shall be deemed equivalent to the primary branch being at the same time declared by the college.

Section IV.—No lecturer or teacher whose proposal as a candidate for recognition by the college has been rejected by the board of examiners, or whose nomination to the college has been disapproved of by the vote of the latter, shall be again proposed in the board of examiners or renominated to the college, until after the expiration of one year from the period of his first proposal or nomination."

" CHAP. VII. Section I.—Any student of medicine who has complied with the regulations of the college, may become a candidate for the degree of doctor of medicine, and if he shall be found *duly qualified by the board of examiners, shall [*449] have the said degree conferred upon him by the college.

Section II.—A candidate for the degree of doctor of medicine shall have attained twenty-one years of age; he shall have pursued the study of medicine, for the term of at least three years as a private pupil, under the direction of one or more regular practitioners; he shall have attended lectures on each of the following branches delivered by lecturers recognized by the college, and during the number of courses set opposite to each branch.

He shall have pursued at least one course of dissections under the direction of a teacher recognised by the college: he shall have attended for at least one year the pratice of some hospital or infirmary recognised by the college, and in which clinical instruction is given.

Section III.—Candidates for examination shall be required to register their names with the dean during either the month of February or of November.

Section IV.—At the time of registry, the candidate shall present to the dean satisfactory evidence of his having attained the legal age; a certificate from his preceptor or preceptors that his medical studies have been extended to the full period of three years, and also the tickets or certificates showing that he has attended the requisite number of courses of instruction delivered by recognised lecturers and teachers.

Section V.—The candidate shall likewise, at the time of registry, present to the dean a thesis of his own composition on some medical subject, and also the history in writing of two cases, the one medical and the other surgical, which he has observed and investigated in some public institution, in the private practice of his preceptor or otherwise.

Section VI.—Each candidate shall pay to the dean at the

(Case of " The Medical College of Philadelphia.")

time of his registry, the sum of thirty dollars as the fee for examination, and he shall pay an additional sum of five dollars for his diploma, should he be approved of by the board of examiners.

Section VII.—The candidates whose names have been duly registered shall, when notified to that effect by the dean, present themselves, individually, before the board of examiners, in order that they may undergo an examination upon the several branches included in the scheme of instruction laid down by the college. The examination shall be conducted by oral and written questions to be *answered accordingly, orally or in writing, [*450] and shall embrace the thesis and cases presented by the candidate, as well as medicine in general. The candidate shall likewise be required to write prescriptions in Latin, both abbreviated and at length, agreeably to the customary *formula.*"

" Chap. VIII. Section I.—At the termination of each period of examination, the dean shall report in writing to the college at its next meeting, the names of those candidates who have been found deserving of the degree of doctor of medicine; when the presiding officer shall declare those candidates entitled to the said degree, and shall direct the corresponding secretary to cause the necessary diplomas to be prepared. The college shall then determine by vote the period at which the degree shall be formally conferred upon the said candidates.

Section II.—The degree shall be formally conferred at a meeting of the college to be held for that purpose, and an address shall be delivered by 'the president, one of the vice-presidents, or by a member selected by the college.

Section III.—All diplomas for degrees in medicine granted by the college, shall be signed by the members of the board of examiners, and by the president, vice-president and corresponding secretary; which officers shall have the right of being present at all examinations."

The trustees of the University of Pennsylvania, having appointed a committee to suggest their views in relation to the powers of the Court in regard to charters for literary purposes, the committee accordingly appeared in Court for the purpose, when the Court after the opening of the case, directed that it should stand over until the first motion day in this term, and that the question should then be argued by counsel.

The case having now come up, it was argued by Mr. *Meredith* for the application, and by Mr. *T. I. Wharton* and Mr. *James S. Smith*, against it.

Mr. *Meredith.*—There are two questions to be considered, which arise out of this application.

(Case of " The Medical College of Philadelphia.")

1. Whether the association is one of those contemplated by the act of assembly.

2. If the objects, articles and conditions are lawful.

1st. The act of assembly is mandatory on the Court. If the society is within the act, there is no discretion about it. Now the act speaks of associations for literary, charitable, or religious purposes. *This may be considered either as a literary [*451] or charitable institution. The object is the advancement of the knowledge or learning of medicine, not surgery. It is therefore a literary or learned society. The legislature have in several instances shown that they regarded colleges as literary institutions; as in *The Case of Dickinson College,* (2 Sm. Laws, 71;) the preamble to which distinguishes between science and literature; *Jefferson College,* (3 Sm. Laws, 478); *Washington College,* (4 Sm. Laws, 335); *Franklin College,* (2 Sm. Laws, 398); *University of Pennsylvania,* (3 Sm. Laws, 53); *La Fayette College,* (Pamph. Laws, 1825–6, p. 56); *Gettysburg College,* (Pamph. Laws, 1831–2, p. 365). In 1789, only two years before the passing of the act under which this question arises, the legislature incorporated the College of Physicians of Philadelphia. If not strictly a literary, this may be considered a charitable association. *Ex parte Wrangham,* (2 Ves. Jr., 609). In *The Attorney General* v. *The Earl of Lonsdale,* (1 Simons, 105; s. c. 2 Eng. Chan. Rep. 55,) the Vice Chancellor said, " The institution of a school for the sons of gentlemen is not, in popular language, a charity; but in the view of the statute of Elizabeth, all schools for learning are to be so considered." Stat. 43 Eliz.; 23 Hen. 8, c. 10; 1 Edw. 6, c. 14; *Porter's Case,* (1 Rep. 22. *b*); *Martindale* v. *Martindale,* (Cro. Eliz. 288); *Case of Magdalen College,* (11 Rep. 71). Charitable uses for education are held to be good, notwithstanding the statutes of mortmain. Bacon's Reading on the Statute of Uses, (4 Bacon's Works, 167–8); 1 Kyd on Corp. 61. In fact, this is not the first application of the kind. In 1827, the charter of the Medical Society of Philadelphia was amended on the certificate of this Court. About the same time, the Central Medical Society was incorporated; and in 1837, the Medical Institute; the members of which receive compensation from those who attend their lectures.

2nd. Is there any thing in the articles unlawful? If there is is not, how can the Court refuse to give their certificate? The power of conferring degrees has been objected to. Now it is well known, that this is a mere honorary distinction. In Pennsylvania, it confers no civil right or privilege. There is no law here requiring a license or diploma to practise medicine. In some parts of Europe, the title of M.D. may be bought for money. The charter of the University of Pennsylvania confers no power

(Case of "The Medical College of Philadelphia.")

on that body to grant degrees.  Act of 1791, (3 Sm. Laws, 53). Such is the case with several other colleges established by the legislature.    In England, a degree of M.D. is not necessary to authorize the practice of medicine.    Willcock on the Laws of the Medical Profession, part II. p. 4.    Degrees appear to have been originally granted in Paris; and they have since been usually conferred by colleges and universities; but there is no law which limits the right of conferring them to the colleges incorporated by the legislature.

[*452]      *Mr.  *Wharton* and Mr.  *Smith*, *contra*.
The trustees of the University of Pennsylvania, the oldest college in the Commonwealth, have felt it to be their duty to state to the Court the objections that have occurred to them in relation to this method of incorporating colleges, by application to the Court, instead of the legislature.    It is proper to remark, that the medical faculty of the University have taken no part whatever in the opposition to the proposed charter; and the trustees by whom the objections are made entertain great respect for the many eminent persons connected with the society asking to be incorporated.    The objections of the trustees are not to the society being incorporated, but to the *manner* in which it asks to be incorporated.

If it is in the *power* of the Court to grant charters of the kind asked for, the Court *must* grant them.    They can exercise no discretionary control.    It is the apprehension of the injurious consequences which may result from the establishment of a power, the exercise of which the Court itself cannot control, that has induced the trustees of the University to object to the present application.    They have considered it more especially their duty to call the attention of the Court to the subject, because, although the act authorizing the Court to grant charters in certain cases has been in force for forty-seven years, this is the first instance of an application to incorporate a college, with power to confer degrees; and the respectability of the applicants might induce a supposition, that the application was well founded, unless the legal objections to it were formally presented.

The preamble of the act of 1791 declares, that " a great portion of the time of the legislature has heretofore been employed in enacting laws to incorporate private associations," &c., and it provides a method of relieving the legislature from the burthen. Now since the passing of the act, nearly one hundred colleges have been incorporated by the legislature.    This is a strong argument against the application.    1st. The preamble speaks of private associations.    Is this, therefore, such a private association? Can a medical college, invested with a large jurisdiction, and

(Case of " The Medical College of Philadelphia.")

powers to be exercised upon a subject of great public importance, and with power to grant honours and privileges to persons not members, be properly called a private society? In all countries, the profession of medicine has been considered in the light of a public trust; and in many states, no one can practise, without a license granted by the public authority. Whatever may have been the original meaning of the word *college*, it has now come to signify an institution for the higher branches of education, established or incorporated by the state. 2 Kent's Comm. 270. 2d. To authorize the Court to grant a certificate, the association must be either for a literary, charitable, or religious purpose. The Court will not go beyond their authority. In *The Case of St. Mary's Church*, (6 Serg. & Rawle, 505,) C. J. Tilghman said, "In this business of charters, the Court acts under *the grant of an extraordinary power of a special nature, and is confined to the cases described in the acts of [*453] assembly." This can hardly be called a literary institution. This word seems to be applicable in the connection, to libraries and other associations connected with literature. Medicine is a science. The constitution of this commonwealth (Art. VII, § 11,) declares, that "The arts and sciences shall be promoted in one or more seminaries of learning:" that is, as would seem, promoted by the direct action of the legislature. Here a distinction seems to be taken between the sciences and other knowledge, which has been followed since. Then it is said, that this may be considered as an association for a charitable purpose. Certainly, in a large sense, all scientific associations may be so considered; and colleges have been sometimes ranked among eleemosynary corporations: but it is obvious, that the legislature had in view institutions established for the purpose of affording relief to the indigent and unfortunate. The decisions under the English statutes of charitable uses are not at all applicable. 3d. Supposing, however, that colleges and academies are within the purview of the act of 1791, there is a peculiar feature here, viz. the power to confer degrees. This is undoubtedly a very high power, and however it may have originated, or whatever may be the intrinsic value of the distinctions, it is certain, that none but the highest institutions have heretofore undertaken to grant degrees in the arts and sciences, and that the power has been granted only by legislative acts of incorporation. It is believed, that there is no instance of any private association having undertaken to grant the degree of Doctor in Medicine. It is in effect, granting a license to practice, since that degree is of great weight in public opinion. In several of the acts referred to on the other side, the legislature has shown its sense of the importance of the distinction. In the act of 1791, the legislature has enu-

(Case of " The Medical College of Philadelphia.")

merated the cases in which it shall be lawful for this Court to act; and it is not a subject on which they will be disposed *ampliare jurisdictionem.* The fourth section of the act of 1791 enumerates the powers of the corporations to be created by that act, and it would seem to follow, that no special power can be conferred, not mentioned in the act. It is true, that the act of 1791, relating to the University of Pennsylvania, does not give the power of conferring degrees; but that act merely united two institutions, which severally possessed that power by their previous charter.

*Reply.*—All the universities and colleges in this country are private institutions; that is, they were founded in a great measure, at least, by private persons. If there be a difference between the preamble and the act, the latter is to govern. There is nothing in the constitution or laws, to prevent the incorporation of colleges by the Court. Nor is there any reason, in relation to medical science, which distinguishes it from any other. The legislature has frequently incorporated *churches since 1791: [*454] yet they are clearly within the act. In fact, an examination of the list of charters granted before the act of 1791, will show that the applications for colleges were then very few. What is a degree, but an honorary distinction, such as is awarded by societies to persons of merit?

HUSTON, J. delivered the opinion of the Court.

On the 16th of April, 1791, was passed an act of assembly entitled " an act to confer on certain associations of the citizens of this commonwealth the powers and immunities of corporations or bodies politic in law," and is in part as follows:—

" Whereas a great portion of the time of the legislature has heretofore been employed in enacting laws to incorporate *private associations;* and it would not only be more advantageous to the public, but also convenient to individuals, who are desirous of being so incorporated, that the same might lawfully be effected without an immediate application in all cases to the general assembly of this commonwealth: therefore be it enacted that,

Section 1. When any number of persons, citizens of this commonwealth, are associated or mean to associate, for any literary, charitable or religious purpose, and shall be desirous to acquire and enjoy the powers and immunities of a corporation or body politic in law, it shall and may be lawful for such persons to prepare an instrument in writing, specifying the objects, articles, conditions, and name, style or title, under which they have associated, or mean to associate, and exhibit and present the same to the attorney-general of the commonwealth, for the time being,

(Case of " The Medical College of Philadelphia.")

who is hereby required to peruse and examine the said instrument; and after such perusal and examination to transmit it with a certificate thereon endorsed, testifying his opinion of the lawfulness of the objects, articles, and conditions therein set forth and contained, unto the Supreme Court; and the said Court is hereby also required, thereupon to peruse and examine the said instrument, and transmit with a certificate thereon endorsed, testifying also the opinion of the said Court, touching the lawfulness of the objects, articles and conditions therein set forth and contained unto the governor of the commonwealth : and if the . said attorney-general and said Court shall certify their opinion as . aforesaid, to be, that the objects, articles and conditions in such instrument set forth and contained are lawful, the governor shall transmit the same to the Master of the Rolls, &c. &c.; . and they shall become a body corporate in law and in fact, by the name style and title in such instrument declared."

The succeeding sections proceed to state the powers of such corporation, which are precisely those stated by Blackstone and others to be the rights and powers *incident to every corporation*. The property to be held is by this law not to exceed £500 per annum.

By an act of the 3d April, 1833, a supplement to the above, the *provisons of the above act are extended to benefi-   [*455] cial societies and associations, and to fire engine and hose companies; and the amount of property which may be owned may be two thousand dollars per annum.

Some of the words used in the preceding acts would seem to give very extensive powers, but they have been considered as not admitting so large a construction as here contended for; in short as authorising this Court to certify only in cases where the articles, objects and conditions are those specified in the following sections, and as are incident to every corporation.   In the first place, the Court cannot certify except in case of private associations; and in the next it is to prevent the necessity of making application to the legislature *in all cases*.   In other words, the objects, articles and conditions, might be quite constitutional in a charter granted by act of assembly, and yet such as were not within the purview of this act. The word powers, is not added to the objects, articles and conditions in the first section; and when the association wishes for a power or powers, or authorities, not mentioned in this act, it must apply to the legislature.   This Court can certify as far as the law gives power; but when an association asks not only to have the powers and rights specified in the act above cited, but other powers not there mentioned or alluded to, it requires of us what the law does not authorise us to do.   For example, the fifth article in the proposed charter, is, " the college

(Case of " The Medical College of Philadelphia.")

shall have power to grant and confirm, in the manner and form prescribed by its by-laws, such degrees in medicine to such students *or others*, whom by their proficiency in learning *or other meritorious distinction*, they shall deem entitled to them, as are usually conferred in other colleges and universities, and to grant to such graduates such diplomas or certificates under their common seal, as may authenticate and perpetuate the memory of such graduation." Now we look in vain for any such authority among the powers which shall belong to a corporation established under the provisions of this act; and if we do not find it there, we have not power to certify as to it.

In Kyd on Corporations, 61, the author speaks of powers existing in certain corporations, which powers could not by common law be granted by the king, who at one time was supposed to have the exclusive power of creating corporations. In such case, says the author, recourse must be had to parliament to grant them, or confirm them when such had been granted by the king; as in the case of the powers exercised by the Universities of Oxford and Cambridge, and the College of Physicians in London.

In this state there was, previous to 1791, no mode of obtaining a charter of incorporation except by act of assembly; and it is a sound principle, that even in such a charter, from the legislature, the corporation has no powers except what are expressly granted, or are necessary to effect the objects expressly granted. [*456] We have *many schools and academies for the advancement of learning; none of which, no institution except a college having express power by legislative enactment, have attempted to confer degrees or give diplomas; and none of which has power to confer such degrees or grant diplomas unless so expressly given. There is a Medical Society, and a Medical Institute already in this city; and the members of those bodies are very much the same persons who propose to form this medical college. They understand perfectly, that their several acts of incorporation do not give the power asked by this fifth section.

We admit that men of higher grade in the departments of medical science, or of greater moral worth than many of the applicants for this charter are not to be found; but they have been mistaken as to the duty and authority of this Court, in the premises. Wherever we have authority to certify, we are bound to certify: if we have authority to certify, and thus in effect incorporate this college with these powers, we must if applied to, grant a similar charter with similar powers to the physicians of every county and town in the state; we have no more right to decide on the degree of medical science in the applicants, than on the piety of a congregation of any religious sect, who apply to us to certify to a proposed charter of incorporation; and this

might place the degree of doctor of medicine in a situation some-what similar to what was threatened by a celebrated minister of France, who said he would create so many dukes, that it would be a shame not to be a duke, and no honor to be a duke.

The degrees conferred in colleges are not offices or appoint-ments, but they confer honour, influence and respectability to a certain extent. The power of conferring such degrees was never meant to be put in such a situation that the attorney-general and this Court were bound to concur in granting it to any associa-tion which wished to be incorporated for literary or scientific purposes, and this without the power of inquiring as to the quali-fications of the applicants, to exercise such power with advan-tage to the community, or advancement of medical science.

We repeat, the act of 1791 authorises us to certify on the ap-plication for a charter by any literary, charitable or religious association, who wish to be a corporation or body politic, with a right of perpetual succession, of a common seal, of suing and being sued, of making by-laws and holding property of a yearly value not exceeding $2000. These powers are specified in that act. Our authority extends no further; and when an associa-tion wishes other authority, or other or greater powers, such can only be obtained from the legislature of the state.

Application denied.